R. D. Leeby v. Commissioner.
Leeby v. Commissioner
Docket No. 42369.
United States Tax Court
T.C. Memo 1956-118; 1956 Tax Ct. Memo LEXIS 177; 15 T.C.M. (CCH) 591; T.C.M. (RIA) 56118; May 16, 1956
James F. X. Conney, Esq., for the petitioner. Merl B. Peek, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined deficiencies in income tax against petitioner for the years 1943, 1944, 1945 and 1946 in the respective amounts of $5,637.89, $6,484.07, $9,553.34, and $10,679.21, and additions to tax for fraud with intent to evade *178 tax for such years in the respective amounts of $2,818.95, $3,242.04, $4,776.67 and $5,339.62. The first question is whether respondent erred in his determination of adjusted gross income for each of the years herein (1) by omitting some purchases of merchandise in arriving at cost of goods sold; (2) by the inclusion in gross income of certain non-income receipts and of receivables accrued in another year or years and (3) in failing to deduct some items representing expense of doing business. The petitioner has also alleged as error the respondent's determination that the deficiency, or a part thereof, as determined by him for each year, was due to fraud, and in the absence of fraud, his failure to determine that the period within which a deficiency for each year herein may be assessed and collected has expired. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioner is a resident of Fargo, North Dakota. He filed his income tax returns for the years herein with the collector of internal revenue for the district of North Dakota. Petitioner has resided in Fargo all of his life and as a sole proprietor has been engaged in business in that *179 city since 1921. His business, during and prior to the taxable years, consisted of the operation of a retail food or grocery store, a catering service, a bakery and a cafe. Petitioner also did a wholesale business covering in the main the sale of bakery goods and the preparation and sale of food in his catering business. In 1929, petitioner rented the first or ground floor and basement of a two-story building located at 420-422 1/2 Broadway in Fargo and moved his business to that location. The first floor space had a high ceiling and there was a balcony or mezzanine, on which petitioner located his office. The basement, which duplicated the first floor as to area, was used for storing grocery stock and supplies. It contained a walk-in cooler where such items, among others, as fish and cheeses, both domestic and imported, were kept. In 1932 petitioner moved his office from the store balcony and took over that space as family living quarters. He had married in 1925. In 1938 he moved with his family into an apartment located about one block from the store building and again moved his office to the balcony. In the early morning hours of November 13, 1940, a fire occurred in the *180 store. The main floor collapsed and fell into the basement. In the course of putting out the fire, the basement became flooded with water, inundating the stock and equipment which was stored there as well as that which had fallen from the first floor. When the fire had been extinguished, the water was pumped from the basement, and petitioner immediately began to remove his stock of groceries and fixtures. The greater portion of such stock was taken to and stored in a warehouse a few blocks from the firedamaged store. Following the fire, and on the same day, petitioner rented a building next door, had telephones installed, brought in a stock of new merchandise through the wholesale grocery companies in Fargo, and resumed the operation of his business. The building so rented had been used at one time for a butcher shop and contained fixtures which were immediately usable in petitioner's business. Some of the cheeses and other perishable commodities which were salvaged from the flooded basement were placed in the new store for immediate sale. On the day following the fire some of the canned goods was offered for sale in front of the store. The water had soaked the labels from many *181 of the cans and the offering prices for such cans were at a level to induce prospective purchasers to take a chance on the contents thereof. Other sales of salvaged canned goods were made during 1940, 1941 and 1942. The construction of a new main floor and repair work in the basement of the burned out store were completed about six months after the fire occurred and petitioner thereupon returned his business to the old location. Many of the salvaged commodities were taken from the warehouse and stored in the basement of the rebuilt store. Some of the damaged stock, however, remained in the warehouse until about 1943. As the need therefor dictated and the necessary time for processing was available, the salvaged commodities susceptible of reprocessing were reprocessed and offered for sale in or along with petitioner's regular stock. As to most such commodities, this did not occur until after 1942. The reprocessing of the fire-damaged goods and the restoring of them to stock in the taxable years was prompted substantially, if not wholly, by the fact that due to the war, the supply of such goods which could then be had was very limited. A substantial quantity of the salvaged stock *182 consisted of dried fruits, such as raisins, prunes, figs, dates and apples. Some of this stock was reprocessed in 1942, while as to other portions the reprocessing did not take place until 1945 and 1946. The reprocessing operation was accomplished by placing the dried fruit in large pans and heating it in the bakery ovens. A quantity of mincemeat was also salvaged and sold. Being in sealed barrels, it did not require reprocessing, but some of it was repacked in jars before being sold. Much of it had been bought for use in the bakery and it was thereafter so used. Petitioner also salvaged a quantity of fruit juices, English walnuts, hard candies, honey, Mexican baskets, and wedding cake ornaments. He was assisted in processing these items by his sister, who was and for 30 years had been a teacher of home economics at North Dakota Agricultural College. She received no compensation for her work. The juices, which had been sealed in glass jars, were made into jellies and placed in glasses of various sizes. About 200 glasses of such jelly were produced in 1943, about 600 in 1944, about 400 in 1945, and about 400 in 1946. The English walnuts were processed during the summer of 1941. They *183 were shelled, the kernels washed and spread on towels, and then put into the bakery oven at low heat. The processing of the candies was begun in 1942. They were melted down and made into soft and hard textured candies. The restoring of the Mexican baskets and wedding cake ornaments was started in the summer of 1941. The baskets were scrubbed with mild soap, rinsed and dried. The wedding cake ornaments were restored by placing new ribbons and laces thereon and covering them with cellophane. About 35 or 40 of such ornaments were repaired by petitioner's sister. The honey, which was sealed in 60 pound tins, had crystalized or "sugared" and was melted into liquid form, after which it was poured into pint and quart glass containers and thereafter sold to customers or used in the bakery. Among the items salvaged was a large quantity of soap. This was processed for sale by cutting off the blackened parts caused by the fire, slicing it into chips, and putting it into barrels for sale in bulk. Also processed and sold was an undisclosed number of brooms. No records were maintained with respect to the quantity of goods so salvaged and reprocessed, the cost or market value thereof at the time *184 of the fire, the cost of such salvaging and reprocessing, if or when, or on what basis, they were taken out of inventory or replaced therein, the years in which they were sold or otherwise disposed of, or the amount of money realized from the sale or other disposition thereof. At the time of the fire, petitioner had two policies of insurance covering the contents of the store. They were in the aggregate amount of $3,000. The loss sustained so greatly exceeded the amount of the insurance under the policies that the insurance company paid the full $3,000 on summary examination only and without making any effort to determine the full amount of the loss sustained. For the year 1940 petitioner filed an income tax return, upon which he made the notation that he had just had a fire and had no tax to report. There was no report of the results of his operations for the year, either before or after the fire. Neither did he report the amount of the loss sustained due to the fire. In 1942, petitioner took over the second floor of the store building, which at one time had been occupied by a dancing school, had all or a part of it converted into a two-bedroom apartment and thereafter occupied *185 it as his residence. He and his family were residing there at the time of the trial herein. On December 3, 1943, petitioner purchased the building [1] at 422 Broadway for a total consideration of $26,000, which was paid $5,000 in 1943, $13,000 in 1944, and $8,000 in 1945. Petitioner did not keep or maintain books of account which were sufficient or adequate to show or reflect the results of his business operations and much of the details of those operations were not recorded. He did during the years in question keep a single entry "day book" in which, on the left hand pages and following the designations "Sales" and "Chg", amounts purporting to represent the aggregate of daily cash sales as shown by the cash register tapes and the aggregate of the daily charge sales reflected by the charge sales slips were entered. [2] The amounts so entered could have included some wholesale sales, but most, if not all, of such *186 sales were not entered in any book. On the right hand pages, amounts purporting to show the disbursements and money taken from the cash register were entered. On some of these pages relating to 1946, notations were also made of wages to employees paid by "chk." *187 At the end of the month and from charge sales slips, petitioner would prepare and send bills to his charge customers. In a book maintained for that purpose and as of the first of each month, he would list alphabetically the names of the customers to whom bills were sent and the amounts billed to each listed customer. Subsequently, usually in pencil, partial credits were shown in relation to some of the names, and in a final column various dates later in the month, which could indicate payment of the accounts as of such dates, were entered as to most of the customers listed. Unless an account was not paid, the original charge sales slips were destroyed after they had been kept "up to a year or more," after which the book listing the bills sent would be the only record of charge sales. Petitioner maintained no record of his merchandise purchases other than those entered in the "day book" as representing purchases for cash taken from the cash register. Neither did he record other amounts owing by him. It was his practice generally to pay within ten days the accounts in respect of which ten days was the discount period. If the discount period was thirty days, he made it a general practice *188 to pay such accounts in thirty days. In so far as appears, bills which were not paid from the cash register and entered in the "day book" were paid by check. Petitioner did not destroy but retained in his office his bank deposit slips, his bank statements, his check stubs and canceled checks. In making his income tax returns for the years herein, petitioner, to some extent, estimated his total receipts [3] on the basis of his experiences in previous years, and from this total deducted what he estimated to have been his business expenses and cost of goods sold. He arrived at the amount used as cost of goods sold by the use of opening and closing inventories. [4]
*189 Having first concluded and determined that petitioner's books and records were inadequate clearly to reflect income, the respondent in his determination of deficiencies herein proceeded generally as follows: To arrive at gross receipts, he started with the deposits made by petitioner during the years herein in his accounts at the Fargo National Bank and Merchants National Bank. From these amounts, he deducted items denominated by him as funds transferred between banks, return of loan, non-taxable gain on sale of capital assets and returned deposits. He next added the amounts determined by him to have been expended by petitioner in cash and not deposited in either of his bank accounts. The resulting amounts were determined to represent petitioner's gross receipts for the taxable years. He next deducted amounts representing cost of goods sold, and in arriving at cost of goods sold, he accepted the opening and closing inventories which had been shown by petitioner on his returns and amounts determined by him as representing merchandise purchased during each of the years. The amounts determined as merchandise purchased by check were arrived at after a study and classification of information *190 contained on petitioner's check stubs. In some instances, however, this information was supplemented by consulting the petitioner personally and by reference to the canceled checks. The cash purchases of merchandise were taken from entries in the "day book." Deducting cost of goods sold from gross receipts, he arrived at the amounts determined as petitioner's gross profits for the years involved. Generally, operating expenses deducted in arriving at adjusted gross income were determined from the check stubs, canceled checks, the "day book" and discussions with the petitioner individually. On the ground that petitioner had not kept books of account so as to reflect accounts receivable and accounts payable, the respondent in his determinations made no allowance or adjustment for accounts receivable or accounts payable as of the beginning or end of any of the taxable years herein. Petitioner maintained two bank accounts, one with the Fargo National Bank and the other with the Merchants National Bank, both located in Fargo. His total deposits in each bank, for the years indicated, were as follows: Merchants Na-
Fargo Na-
Year
tional Bank
tional Bank
Total
1943
$86,473.99
$17,431.84
$103,905.83
1944
42,074.61
87,091.07
129,165.68
1945
76,329.24
51,873.69
128,202.93
1946
98,866.35
69,349.46
168,215.81
*191 The cash not deposited and representing amounts paid in cash from the cash register, as determined by respondent from the "day book," and for the years indicated, was in the following amounts: 1943
$19,931.74
1944
9,935.12
1945
9,652.02
1946
9,007.60
In December 1944, and pursuant to court order, petitioner received from Northern States Power Company rebates in the aggregate amount of $1,153.14 on amounts previously paid by him for gas and electric power supplied to his store and personal abode by that company. Except for $12.15 for gas and electricity which had been furnished at the apartment where petitioner resided from 1938 to 1942, and possibly 91 cents, shown as having been supplied to Leeby & Morrish, 412 Broadway, the rebates had to do with amounts paid for gas and electric power supplied to petitioner's store building. There being no additional meters, there was no segregation of these amounts with respect to the gas and electricity supplied to the store building as between the gas and electricity used by petitioner in the operation of his business and that consumed through the use of the balcony for living quarters. In 1945, petitioner sold a *192 piano for $275, the proceeds of which sale were deposited in one of his bank accounts. On May 6, 1946, petitioner deposited $12,000, all in currency, in the Fargo National Bank, which deposit was substantially greater than any other single deposit made by him during the years herein, the second largest deposit having been $9,119.32, on June 27, 1946. On October 10, 1946, he made a single deposit of $8,466.75, and on November 18, 1946, a single deposit of $8,624.29. Over the years in question, he had a number of single deposits of $6,000 or more. The greatest aggregate amount of deposits made for any one month in 1946 was $24,978.61, for the month of May. The second largest aggregate amount of deposits for any one month in 1946 was for the month of November, in the amount of $18,666. His deposits for August of that year amounted to $16,122.53. The lowest aggregates of deposits for 1946, by months, were $8,357.73 for April and $8,466.75 for October. The average of his deposits by months for 1946 was $14,017.98. From January 1, 1941, up to September 20, 1943, the entries in the "day book" indicate periodic cash withdrawals from the cash register by petitioner and his wife. From and *193 after September of 1943, through 1946, there are no entries of withdrawal of cash by Mrs. Leeby. There are entries showing regularly recurring withdrawals by petitioner, usually once each month. For 1941, petitioner and Mrs. Leeby are shown as having made thirty-two such withdrawals, amounting in the aggregate to $300. Petitioner's withdrawals are shown to have been twenty in number, amounting in the aggregate to $270 and ranging from $1 to $20. Mrs. Leeby is shown as having made four withdrawals, three of $5 each, and one of $15. For 1942, petitioner and Mrs. Leeby are shown as having made eleven withdrawals, amounting in the aggregate to $151.50. Of these withdrawals, seven, amounting to $110.50 and ranging from $7.50 to $40, were made by petitioner. Mrs. Leeby is shown as having received $5 in each of January and February, $10 in August, and $21 in September. For 1943, the "day book" reflects no withdrawals by petitioner prior to August 3. It indicates six withdrawals by Mrs. Leeby, amounting in the aggregate to $64.20, ranging in amounts from $1 to $32, the last such withdrawal being $10, on September 20. Beginning with August 3, petitioner is shown as having withdrawn $50 *194 on five different dates, with no amount shown for October, but two amounts shown for December. For 1944, petitioner is shown as having made thirteen withdrawals, amounting in the aggregate to $675, ten of which were of $50 each, one of $55, and two of $60 each. For 1945, petitioner is shown as having made fourteen withdrawals, amounting in the aggregate to $630, nine of which were of $50 each, one of $30, one of $10, one of $60, and two of $40 each. There was at least one withdrawal in each month of the year. For 1946, petitioner is shown as having made fourteen withdrawals, amounting in the aggregate to $471 and ranging in amounts from $10 on two occasions, to $60 on one occasion, and with at least one withdrawal in each month. At December 31 of the years indicated, the following amounts were owing to petitioner by his charge customers: Year
Amount
1942
$4,709.94
1943
2,855.77
1944
3,721.04 *
1945
2,522.04 *
1946
4,382.40
*195 Petitioner's accounts payable at December 31 of each of the years indicated, including amounts covering merchandise purchased but not paid for were as follows: Year
Amount
1942
$2,119.80
1943
1,500.00
1944
4,971.61
1945
5,129.60
1946
3,000.00
In addition to the amounts allowed by the respondent in his determination for 1945 for goods purchased, petitioner made purchases on February 5, 1945, paying therefor by check on the Merchants National Bank in the amount of $57.37. For the year 1946, merchandise purchases by petitioner for which respondent made no allowance were: Date
Payee
Amount
September 20, 1946
Burry Biscuit Co.
$119.50
October 10, 1946
B. C.Food Co.
21.10
May 6, 1946
Cass-Clay Creamery
52.10
June 29, 1946
Cass-Clay Creamery
128.34
October 30, 1946
Atmore Company
79.25
In addition to the above, the respondent understated purchases of $27.25 and $199.30 in 1946, by allowing only $21.25 and $119.30, respectively, therefor. In his determination of the petitioner's business expenses for 1945, respondent failed to take into account payments made during that year to three employees in the aggregate amount *196 of $36.60, and in one other instance he allowed only $26.10, whereas the amount actually paid was $46.10. Respondent also failed to allow $38.50 expended by petitioner in 1945 for repairing an exhaust fan in the bakery. For 1946, respondent, in determining petitioner's business expenses, failed to allow amounts paid as wages to employees in the aggregate amount of $115.20. With respect to another employee, he allowed only $5, whereas the compensation actually paid was $50. In his determination for 1946, the respondent allowed $27.25 as a repair expense, whereas the payment actually made was $2,725, and represented the cost of a new addition to petitioner's store building and not repair expenses. Due to this error, depreciation was understated by $56.84. After they had been refinished petitioner, in 1946, sold some or all of the store fixtures salvaged from the fire in 1940. On the basis of discussions had by respondent's agents with petitioner, the respondent in determining the deficiency for 1946 excluded $750 from gross receipts as representing non-taxable receipts on the said sale. Under date of March 12, 1946, and by check, petitioner paid $290 to A. J. Nemzick as a commission *197 for selling a "chicken ranch" located at Moorhead, Minnesota. On June 24, 1943, petitioner purchased a warehouse and the lot on which it stood for $950. In 1944, he converted the warehouse into a duplex dwelling through an expenditure of an additional $4,500. In 1944, he purchased a vacant lot at 416 Broadway, in Fargo, for $3,000. The $3,000 was paid $1,000 in 1944, and $2,000 in 1945. The net income reported by petitioner on his returns for the years herein, the net income now conceded by petitioner on brief and the net income determined by respondent for the said years, were and are as follows: Net Income
Net In-
Conceded by
come Deter-
Net Income
Petitioner
mined by
Year
Reported
on Brief
Respondent
1943
$5,218.44
$11,465.00
$19,270.30
1944
6,217.62
13,005.91
21,128.89
1945
8,149.00
18,291.65
27,157.27
1946
8,839.00
14,576.09
31,149.95
On December 14, 1950, the petitioner was found guilty in the United States District Court for the District of North Dakota of "unlawfully attempting to defeat and evade a large part of the income tax due and owing by him to the United States of America for the years 1944, 1945 and 1946, *198 in violation of Section 145b, Title 26, U.S.C." The judgment of the district court was affirmed in the United States of Appeals for the Eighth Circuit, at 192 F. 2d 331. The income tax deficiency in whole or in part for each of the years herein is due to fraud with intent to evade tax, and the income tax returns filed by petitioner for those years were false and fraudulent with intent to evade tax. Opinion That such books of account as petitioner did keep and maintain for the years herein were insufficient and inadequate to reflect his income, is definite and clear, and is borne out, in fact, by testimony of both petitioner and his accountant. Using such records, data and information as were available, it was accordingly left to the respondent, in making his determinations, to follow the course which in his judgment would most nearly reflect petitioner's net income and the tax thereon. In making his determinations, the respondent started with petitioner's bank deposits during the taxable years, and after making allowance for such items as transfers of funds, return of loan, non-taxable gain on sale of capital assets and return deposit, added amounts determined *199 from the "day book," miscellaneous records and oral representations by petitioner as receipts not deposited, to arrive at the amounts determined by him as petitioner's gross receipts. To arrive at cost of goods sold, he used the opening and closing inventories reported by petitioner on his returns, and determined merchandise purchases during the years from the "day book," check stubs, canceled checks and petitioner's representations. Deducting cost of goods sold, as so determined, from gross receipts, he arrived at the amounts determined as petitioner's gross profits. Operating expenses deducted from gross profits to arrive at net profits or adjusted gross income were determined generally in the same manner as merchandise purchases. The petitioner does not appear to resist respondent's use of petitioner's bank deposits as the starting point in making his determinations, but rather, contends that the resulting amounts are excessive, by reason of respondent's failure to eliminate additional non-income items, to make adjustments for accounts receivable and accounts payable at the beginning and end of each year, by omitting some purchases of merchandise in arriving at cost of goods sold, *200 and in failing to deduct some items representing expense of doing business. By the use of opening and closing inventories for the purpose of arriving at the cost of goods sold, the respondent, in effect, recognizes that receivables and payables as of the beginning and end of each taxable year should be taken into account, if income is properly to be reflected. See section 29.41(2), Regulations 111, wherein it is stated that "in any case in which it is necessary to use an inventory, no method of accounting in regard to purchases and sales will correctly reflect income except an accrual method." The only answer offered as to his failure to allow for accounts receivable and accounts payable at the beginning and end of each year is that it was not possible to determine those amounts, due to the petitioner's failure to maintain records from which they might be determined. The proof shows, we think, that petitioner did maintain records from which his accounts receivable might be determined. As of the first of January in each year bills were prepared and sent to most, if not all, of petitioner's customers having balances due, and the details of those bills, including the name of the customer *201 and the amount due and owing, were regularly listed by petitioner in books maintained for that purpose and those books are now of record. We have set forth in our findings amounts representing the accounts receivable as of the end of each year pertinent herein, which amounts are the amounts reflected by the books in which bills sent were listed, except where the petitioner has claimed a lesser amount, and in the computations hereunder effect should be given to those findings. As to bills payable covering goods purchased but not paid for at the end of each year, as well as expenses incurred but not paid, there is very little competent proof of record. We do have, however, a list of the individual items as prepared by and representing the conclusions of petitioner's accountant, on the basis of his examination of the records and papers of the petitioner, his conversations with petitioner and responses to inquiries made of various individuals and concerns with which petitioner did business, which items are here claimed by petitioner as representing his bills payable at the end of each year. We also have of record schedules prepared by respondent's agents and used by the respondent in *202 his determinations herein, which schedules purport to show all of petitioner's checks drawn upon his two bank accounts during three of the taxable years. These checks are listed according to the payees, and the agents, in making their examination of petitioner's records and from conversations with him, have classified the expenditures on the basis of the purposes for which the checks were drawn. To a very substantial extent, the items claimed by petitioner as his accounts payable as of the ends of the respective years coincide exactly, both as to payees and amounts, with many of the payments made early in January of the next succeeding years as shown by respondent's own schedules, and we have concluded that such coincidence of items fairly and reasonably reflects the bills payable as of the end of the preceding years, and the amounts representing bills payable as shown in our findings of fact are those amounts, except as to the bills payable at December 31, 1943, and December 31, 1946, there being as to those dates no schedules from which any agreement as between the conclusions of the respondent's agents and the present claims of petitioner may be reconciled. As to those years, the *203 amounts found as bills payable have been arrived at through application of the principle laid down in Cohan v. Commissioner, 39 Fed. (2d) 540. As claimed by petitioner, the non-income items not excluded from income by respondent fall into five categories, (1) receipts from the sale of fire-damaged merchandise; (2) receipts from the sale of fire-damaged store fixtures; (3) $12,000 deposited on May 5, 1946, and claimed by petitioner to represent savings in years prior to the years herein; (4) amounts received in 1944 as rebates on payments previously made to a utility company for gas and electricity; and (5) proceeds from the sale of a piano in 1945. We are satisfied from the testimony of a number of witnesses that petitioner did, during the taxable years, recondition or reprocess and sell substantial quantities of goods which had been salvaged from his store after the fire in November of 1940. Admittedly, the proceeds from the sale of such goods during the taxable years were not eliminated by respondent from gross receipts in his determinations herein. It is the claim of the petitioner that such goods were sold at less than cost, that no part of the proceeds from their *204 sale represented profit and that the entire proceeds should here be excluded. We have carefully studied the arguments of the parties and have examined the record for evidence with respect to the goods in question, and have concluded that petitioner's contentions are not supported or justified by the proof. That petitioner sustained a substantial loss on his stock of merchandise, due to the fire in November of 1940, is established and accepted, the amount of such a loss being the difference between his basis therefor and the salvage value thereof. We are not advised as to either amount. We only know that petitioner filed a return for 1940, on which it was stated that because of his losses occasioned by the fire, he had no tax for that year. Allowing for the loss due to the fire, the salvage value of the merchandise would become its basis, or, stated otherwise, the amount at which it would be continued in inventory, and if so continued in inventory at or after the fire, its basis in any subsequent year would, generally speaking, be the amount shown therefor in the opening inventory for that year, and there would be no more justification for eliminating the sales proceeds from gross *205 receipts than for eliminating the proceeds from the sale of any other merchandise in stock. On the other hand, if the fire-damaged merchandise was eliminated completely from petitioner's inventory from and after the fire, the effect was a claiming of the entire basis for such merchandise as a loss in the year of the fire, without regard to its salvage value. There is some suggestion or argument on the part of the petitioner that after the fire the salvaged goods were not thereafter included in any amount in the inventories taken or reported by him, and if that is the case, it would follow that the use of cost in determining gain or loss in the year of the sale, as contended for above, would in effect be the taking of the fire loss a second time, namely, in the year of sale, as well as the year of the fire. It is also to be noted that some, and possibly a substantial part, of the cost of the fire-damaged goods as they stood at the time of sale was due to the reprocessing and reconditioning thereof. It is true that some of this work was done by petitioner's sister, at no charge, and some by petitioner himself at no cost and for which he was entitled to receive no deduction. Much of the *206 work was done, however, by employed personnel and the costs so incurred are not shown to have been segregated for any of the years herein from other expenses of operation. To the extent of such costs, the effect of the exclusion of sales proceeds would obviously be the allowance of a double deduction. Such being the state of the record and in the absence of proof that petitioner has not and is not receiving full allowance of his proper basis for the fire-damaged goods sold in the taxable years, his contention is rejected. As to the sale of the fire-damaged fixtures, the respondent in his determination has excluded $750 as being non-taxable receipts from the sale of such fixtures in 1946. This determination, according to the record, was based on petitioner's oral representations to respondent's agents. The petitioner now claims that sales of such fixtures were in much greater amounts and were likewise made in 1943, 1944 and 1945, as well as 1946. If such was the case, the proof does not supply an adequate basis for a finding to that effect. Neither is there any showing of the original or depreciated cost of the fixtures at the time of the fire, their salvage after the fire, the *207 cost of refinishing, or whether the costs so incurred have been allowed as business expenses. For failure of proof, the petitioner's claim for additional exclusions from gross receipts with respect to the proceeds from the sale of the fire-damaged store fixtures is denied. It is the claim of the petitioner that the respondent erred in not excluding, in his determination of gross receipts for 1946, the amount of $12,000 representing currency in that amount deposited in the Fargo National Bank on May 6 of that year. It was his testimony that early in his business career, and on the advice of a former employer whose judgment was highly regarded, he began saving $50 each month and continued that practice for the next twenty years, when, by 1940, the amount so saved had reached the figure of $12,000. And due, partly at least, to his wife's fear of banks, this amount was not deposited in a bank, but was kept in currency in a metal box, the box being kept in his office at the store, but in 1946 he and his wife decided that the money should be deposited, and on May 6 of that year it was deposited as indicated. As to the existence of the box and the presence of currency therein at various *208 times, there was some corroboration from petitioner's wife. We listened carefully and attentively to the petitioner in the course of his testimony and to the testimony of his wife, and we are satisfied that petitioner, for some period of time at least, did have such a box and from time to time did keep currency in it, and it may be that prior to the making of the deposit on May 6, 1946, the $12,000 was counted from the box. Not only, however, are we not satisfied that the $12,000 was accumulated and retained in the box, as petitioner contends, but on the record as a whole, we are satisfied to the contrary. By saving $50 each and every month for a period of twenty years, petitioner would in 1940 have had $12,000. and no more, and assuming that he did enter upon and persevere in such a saving program, other parts of testimony tend to refute the claim that the box contained $12,000 in 1940. It was his testimony that from time to time, when needed, he borrowed from the funds theretofore placed in the box and that it was only by reason of the existence of such savings and the use thereof that he was able to weather the depression. We are not advised as to the amount so used or required *209 in order to save his business during the depression, nor the period over which such use continued. We have only the assertion that the amounts taken from the box were replaced later, but in that respect there is no detail as to how and when or at what rate that was accomplished. Another "borrowing" from the box, as we understand it, and according to petitioner's proposed findings of fact, occurred after the fire in 1940, wherein, according to petitioner's testimony, "we lost everything and we had very little insurance." And it was the testimony of the representative of the insurance company that the loss so greatly exceeded the amount of the insurance that he made no effort to determine the amount of the loss. To support the claim that the $12,000 deposited on May 6, 1946, in the Fargo National Bank, did result from a systematic and regularly maintained practice of setting aside $50 per month, beginning in the early twenties, and that the deposit was the deposit of those savings, his counsel argues in corroboration petitioner's practice in drawing cash monthly from the cash register, as reflected in his "day book." Examination of the "day book" fails to make such corroboration. The *210 entries in the first of the two "day books" placed in evidence began with January 1, 1941, and those in the second book extend through the taxable years. From those entries, it appears that the aggregate of such withdrawals made by both petitioner and his wife for 1941 amounted to only $300, of which $270 was withdrawn by petitioner in twenty-eight withdrawals, ranging in amount from $1 to $20. Mrs. Leeby made four withdrawals, three being for $5 each and one for $15. For 1942, petitioner is shown as having made only seven withdrawals, amounting in the aggregate to $110.50 and ranging from $7.50 to $30. Mrs. Leeby is shown as having withdrawn $31 in 1942, in four withdrawals. There are no entries of withdrawals by petitioner from January 1 of 1943 to August 3. Mrs. Leeby, in the meantime, had made five withdrawals, ranging from $1 to $32, for a total of $64.20. Beginning with August 1943, through the taxable years, petitioner did begin the making of withdrawals, usually once each month, and for the rest of 1943, 1944 and 1945, most of those withdrawals were at the rate of $50 per month. His total withdrawals were $250 for 1943, $675 for 1944, and $630 for 1945. In 1946, his withdrawals *211 were more varied in amount, ranging from $10 on two occasions, to $60 on one occasion. For only February and October were the withdrawals at the $50 rate, and his total withdrawals for 1946 amounted to $471. Mrs. Leeby was not shown as receiving any cash after receiving $10 on September 20, 1943. Further, there is no proof or indication that either the petitioner or his wife obtained the cash required and used by him and his family for personal purposes by withdrawals from either of his bank accounts. The schedules of checks prepared by respondent's agents in the course of their examination do list two checks for $200 each, drawn in October and November of 1946, to Jean Rae Leeby. The record shows that Jean Rae is the only child of petitioner and his wife, and according to petitioner's return for 1943, Jean Rae was fourteen years old as of December 31 of that year. It is thus apparent, we think, that for the years 1941 through 1946 there is no indication in the "day book" entries of a systematic saving of $50 in cash per month. Instead, there being no other source shown for the petty cash normally required in a family, the record could in reason indicate that the cash so shown was *212 drawn for day-to-day family and personal uses. It could be that the entire $12,000 deposited on May 6, 1946, was taken from the metal box at the time it was counted for deposit. But that is not to say that it was currency which had been in the box prior to the taxable years herein, or prior to 1946. We have not only reviewed the evidence of record with great care, but we have set out above certain evidentiary facts which are established and may throw some light on the question, and on the record before us, we are unable to find or conclude that the $12,000 which was deposited by petitioner on May 6, 1946, did not represent business receipts for that year. The respondent's determination is accordingly sustained. Except as to $12.15, shown by the record as having been rebated on payments for gas and electricity supplied to the apartment occupied by petitioner and his family separate and apart from the store, the respondent is also sustained in not excluding from gross receipts the $1,153.14 received as rebates on amounts previously paid for gas and electricity to the Northern States Power Company. We are not advised as to the basis on which the rebates were determined. We do not *213 know whether they represented funds placed in escrow pending a final determination of rates, or how the prior payments were handled. There is nothing of record to indicate that whatever the arrangement petitioner did not, in the years of payment, claim and receive the benefit of deduction of the full amounts billed to his store and paid to the company, and so far as we know, he was entitled to such deductions if so claimed. In short, there is no proof or showing that the amount in question, except for the $12.15, did not constitute, and properly so, the receipt of income. It is, of course, noted that 91 cents represented a rebate to Leeby & Morrish, 412 Broadway. No point is made of that fact, and so far as we are advised, that likewise came to petitioner in a manner and on a basis comparable to his receipt of the other amounts. It is also true that for the period from 1932 to 1938, petitioner's residence was on the balcony of the store and some of the gas and electricity consumed was for personal, and not business, use. It was petitioner's testimony, however, that there were no separate meters, and accordingly no segregation as between business and personal purposes of the gas and *214 electricity consumed. It follows, we think, that the amounts paid for gas and electricity during such period were treated by petitioner as business expenses. At any rate, there is no proof that such was not the case. The parties are in seeming agreement that in 1945, and for $275, the petitioner sold a piano and deposited the proceeds in one of his bank accounts. It is petitioner's claim that the respondent erred in not excluding that amount in arriving at his business receipts. If the piano had a cost basis, it would appear that there is justification for petitioner's claim certainly to the extent of such basis. It might also be that such gain as was realized was not taxable in full, but as capital gains. The petitioner has offered us little or no assistance beyond the contention made that the entire amount should be excluded from gross income. At one time it is shown that he represented or stated that he, or he and his wife, bought the piano and had owned it for fifteen years. At one place in his testimony, however, he represented that it had been obtained, at some date not shown, from his wife's sister in return for living accommdations which had been furnished to her. If such *215 was the case, it might well be that in the year the piano was received, income was realized to the extent of its fair market value. If it was so received, we are not advised as to when that occurred, as related to the year of the sale, or what the amount of realization was as represented by its receipt. In the circumstances, we are unable to say that the respondent erred in not excluding the amount received upon the sale of the piano. In addition to the above, the petitioner also alleged as error on the part of the respondent his failure to allow a number of expenditures as cost of goods sold and expenses of operation. All of these items, except three, have either been conceded by the respondent or disposed of in our findings of fact. Of the three remaining items, one purports to represent the cost of scales purchased from the Detecto Sales Company, and claimed to have been sold in 1945; the second, the cost of silverware claimed to have been purchased in 1946 and sold to the American Legion and the Elks in Fargo; and the third, $290 paid to one A. J. Nemzick in 1946 as commission for selling a "chicken ranch" located at Moorhead, Minnesota. After study and review of the evidence *216 of record, it is our conclusion that the respondent must be sustained as to each of the three items, for failure of proof. As to the scales and the silverware, we are really not advised except as to the claim with respect thereto. Certainly there is no evidence for concluding that they could or would in reason have been any part of petitioner's stock in trade. Furthermore, we have no evidence with respect to their sales. The respondent does not dispute the payment of $290 to A. J. Nemzick. He does take the position, however, that, even though paid, it is not deductible as an expense incurred and paid by petitioner in the operation of his business, as petitioner claims. By petitioner's own representations, it is apparent that the item was not a business expense incurred and paid by him in the operation of his food and grocery business. Neither does it appear that it was an expense incurred and paid in any other business of petitioner, and the respondent did not err in failing to allow it as an expense deduction. As a general matter, commissions not paid in the operation of a business regularly carried on, but on a casual sale of property, are not items of deduction under the statute, *217 but are to be taken into account in arriving at gain or loss realized or sustained on the property sold. See Carl W. Braznell, 16 T.C. 503. In so far as the record shows, the property was not operated by petitioner as a chicken ranch, even though it may have been developed for that purpose, and in the normal case the proceeds of sale of such a property would represent income only to the extent that the selling price exceeded cost plus expense of sale, which would include the commission, and if the property had been held for the required length of time, such gain as was realized would be entitled to capital gains treatment in reporting income and computing the tax thereon. There is in this instance, however, no showing or claim that the proceeds from the sale of the so-called chicken ranch constituted a part of the deposits in the two bank accounts during the taxable years, or that the $290 paid as commission was not paid from the receipts from petitioner's food and grocery business. Such being the state of the record, there is no basis on which we could allow either an exclusion of the $290 from gross receipts, or the deduction as an expense incurred and paid by petitioner *218 in the operation of his business. We have remaining the question of fraud, first, whether petitioner's returns for the years in question were false and fraudulent with intent to evade the tax, in which case there is, under section 276(a) of the Internal Revenue Code of 1939, no period limiting the time within which the deficiencies herein may be assessed and collected, and second, whether the deficiencies, or any part thereof, were due to fraud with intent to evade tax, in which case the additions to tax prescribed by section 293(b) of the Code are to be made. It is to be noted from our findings of fact that petitioner, on the basis of his claims as to his correct tax, in effect concedes that as to the years 1943, 1944 and 1945, he understated his income in his returns by more than 100 per cent, and in his return for 1946 by only slightly less than 100 per cent, even though the amounts, in effect, so conceded are substantially less than the amounts determined by the respondent. His claim is that he was not skilled in bookkeeping matters or in computing and reporting his income; that due to the scarcity of help during the war years, which include the tax years herein except 1946, *219 he did not have the time to keep proper records of his operations; that he was generally negligent in the keeping of his accounts and in the preparation and filing of his returns; that he had no realization that the results of his operations were as large as they were, and that he was not guilty of fraud with respect thereto. We have carefully observed and listened to the petitioner throughout his testimony, and we have examined and re-examined the transcript of his testimony and the other evidence of record. We are satisfied and convinced that petitioner is and always has been a thrifty, careful and frugal man. And while we have no reason to doubt his statements that he is not trained or skilled in matters of accounting, we are convinced and satisfied from his testimony and the evidence of record that in reporting his income he was not unaware of the fact that the results of his business operations were far greater than represented and reported by him to have been. We are not at all certain as to the source or basis of the figures reported by him as his income for the years herein. At one or more times, it was his representation that they were estimated on the basis of his experiences *220 of the preceding year or years, whereas his testimony throughout indicates his awareness, knowledge and consciousness of the fact that in the production of income there was little resemblance between his business in the tax years and those preceding. At one place in his testimony, his explanation was that he was required to make quarterly reports of his sales to the State of North Dakota for the purposes of the North Dakota sales tax, and that the income reported in his Federal income tax returns was based on the sales reported to the state. If such was the case, and in the absence of some explanation or showing with respect to his state reports, the explanation, rather than showing that the understatement of income was due to negligence rather than fraudulent intent, would merely be to put his reports to the State of North Dakota in the same category as his reports of income for Federal income tax purposes. Not only did petitioner grossly understate his income for each of the taxable years, as now in effect conceded by him, but we are satisfied from the evidence that he was aware and conscious of such understatement at the time of making his returns, that the returns as filed were *221 false and fraudulent with intent to evade tax, and that all or a part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. Decision will be entered under Rule 50. Footnotes
1. This finding is from a written stipulation of the parties, whereas the address of the store is variously shown of record as 420 to 422 1/2 Broadway. Presumably, however, the store occupied a single building and that was the building purchased in 1943 for $26,000.↩
2. Opposite the designation "Sales," the entries for each day were in most instances in two amounts in two separate columns, and in respect of which there is no explanation although there is some indication in a few places in the book that the entries in the second column could have related to operation of the cafe or the catering department, or both, and might have been intended to represent the aggregate of amounts taken from the tapes of the cash register for cafe and/or the catering department, and possibly even the bakery. That the amounts so entered in the "day book" as the daily receipts were not accurate or complete even as representing the daily aggregate amounts shown by the cash register tapes, is indicated by the fact that beginning July 18, 1944, the "Sales" entries in the first column reflected even dollar amounts only and there were no entries representing odd cents, and beginning with the entries for May 26, 1945, this was also true as to the amounts entered as reflecting the aggregate of the daily charge sales and the amounts entered as "Sales" in the second column. Aside from a complete lack of probability that the aggregate of the cash or charge sales for any day would be in even dollars only, it is to be noted that the amounts for which customers were billed at the first of each month (see the finding in the next succeeding paragraph above) were in even dollar amounts in very, very few instances.↩
3. The extent to which he may have used such records as he did have in arriving at his total receipts for any year is not clear. On one or more occasions petitioner had stated or testified that his reported receipts were estimated on the basis of his experience in prior years. At the trial herein, he gave some testimony to the effect that in reporting his income he had relied, to some extent at least, on quarterly reports made to the State of North Dakota for state sales tax purposes. ↩
4. How or on what basis the amounts so used as his opening and closing inventories were arrived at, is not shown, neither is there any indication of record that any records were maintained for recording inventories, when and if inventories were actually taken.↩
*. These amounts, while slightly less than the aggregate of the amounts entered in the "bills sent" book as of January 1 of the next year, are the amounts claimed by petitioner as being the aggregate of the amounts owing to him by customers as of December 31 of the two years indicated. The amounts shown for the other three years are the aggregate of the amounts of the bills sent to customers as of January 1 following, as indicated by the said book.↩